**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| **BELINDA A. GARZA,** | § | |
| *Plaintiff,* | § | |
| | § | **CIVIL ACTION NO.** |
| | § | |
| **VS.** | § | **(JURY REQUESTED)** |
| | § | |
| **SECURITY FIRST FEDERAL** | § | |
| **CREDIT UNION,** | § | |
| *Defendant* | § | |

## PLAINTIFF BELINDA A. GARZA'S ORIGINAL COMPLAINT

**TO THE HONORABLE U.S. DISTRICT COURT JUDGE:**

**COMES NOW, BELINDA A. GARZA** (hereinafter referred to as Plaintiff) hereby files this Complaint and Jury Demand against the **SECURITY FIRST FEDERAL CREDIT UNION** (hereinafter referred to as the "Defendant" or the "Defendant Credit Union") alleging willful violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq., Americans with Disabilities Act, 42 U.S.C. §12101, *et seq.,* and as amended by the ADA Amendments Act of 2008 ("ADA-AA")*;* FMLA, 29 U.S.C. §2601, *et seq.* For causes of action, Plaintiff would show the Court as follows:

## I.
### Parties

1.      Plaintiff, BELINDA A. GARZA, is an individual residing in Edinburg, Hidalgo County, Texas.

2.      Defendant, SECURITY FIRST FEDERAL CREDIT UNION is an entity entitled to conduct business in Texas, and may be served  with process on the Defendant may be effective *via certified mail, return receipt requested*, by serving its President/Interim CEO Christine Dawe

registered agent for service as follows:

**CEO Christine Dawe**
**President/Interim**
**3515 S. Jackson Rd.**
**Edinburg, Texas 78539**

## II.
## Venue

3.      Venue is proper in the Southern District of Texas, McAllen Division under 28 U.S.C. §1391 because Plaintiff's claims arose within the judicial district of this Court.

## III.
## Jurisdiction

4.      This Court has subject matter jurisdiction because this cause of action arises under Title I of the Americans with Disabilities Act and the Age Discrimination In Employment Act.

5.      Defendant Security First Federal Credit Union is an employer within the meaning of the above statutes because it employs fifteen or more employees for each working day in each of twenty or more calendar weeks.

## IV.
## Administrative Procedures

6.      Within 300 days of the occurrence of the acts complained of, Plaintiff filed her initial complaint with the Equal Employment Opportunity Commission alleging that the Defendant had committed unlawful employment practices against the Plaintiff. The formal charge and the "Dismissal and Notice of the "Right to File Civil Action Letter" were filed and received as follows:

Formal Complaint Filed:              May 19, 2020


Civil Action Letter Received:        May 21, 2021

7.      On May 21, 2021, Plaintiff received from the United States Equal Employment Opportunity Commission, Plaintiff's Dismissal and Notice of Rights letter allowing the Plaintiff to file this lawsuit within ninety days of its receipt.   Plaintiff's statutory claims were filed within ninety days of its receipt. Plaintiff further invokes the relation back theory as well as any and all equitable doctrines necessary to satisfy the administrative requirements set forth by law.   All conditions precedent to the filing of this lawsuit and as required by law have been performed or have occurred.

**V.**
**Factual Background**

8.      On or about October 2014, Plaintiff was hired by Security First Federal Credit Union as a Collections Manager earning $49,500.00.  At the time of Plaintiff's termination, she was earning approximately $69,900.00, plus fringe benefits. During her five years and eight months of employment, Plaintiff had performed all her duties with dedication, hard work and loyalty. Plaintiff was treated as a valued member of the team.  During Plaintiff's first day on the job, Gerald Pennington, the Chief Lending Officer, and she met with Dan Perez, the Chief Executive Officer to discuss her new assignment.  During their meeting, Mr. Perez notified Plaintiff that Gerald Pennington had submitted his two-week notice.  After Mr. Pennington's departure from the credit union, Will Eggleston was hired as the new Chief Lending Officer; however, Plaintiff was told by Dan Perez that she would report directly to him and that Blake Services, a consulting company would be training Plaintiff's staff and her in Collections for a period of two years twice a week.  Delinquency was extremely high and immediate results were needed for the credit union to improve its bottom line. Training through Blake Services was effective.  Charles Blake, owner of Blake Services, and Plaintiff met weekly to discuss strategies to effectively bring down delinquency for the credit union, as well as, how to navigate Collections

going forward.  They also discussed Plaintiff's performance and how well she and her team were doing.

9.      After several months of training with Blake Services, Plaintiff began reporting to the Chief Financial Officer, Joe Garcia.  While under the direction of Joe Garcia, Plaintiff's title changed to Assistance Vice President of Collections. She received a bonus during her review. Plaintiff was excited that the credit union recognized her ability to effectively manage Collections and that the credit union delinquency was improving steadily. Plaintiff felt that the credit union was where she wanted to be and ultimately retire from the credit union.

10.     The Human Resources Manager Michelle Castellanos stated that Plaintiff's staff retention rate was great considering that turnover in Collections had been high prior to her arrival. Ms. Michelle Castellanos also mentioned that during a survey, Plaintiff had received good feedback from her staff about her leadership. This was significant to Plaintiff considering the department's prior high turnover. As of April 2020, most of Plaintiff's staff in Collections were the same individuals as when Plaintiff started. Any reduction in staff count had been due to decreasing delinquency. Several members of Plaintiff's staff were promoted to other departments, including one who was promoted to management.  In 2015, Plaintiff's staff count was fourteen. In 2020 Plaintiff's staff count was eight.  In January 2017, delinquency was at approximately 3.52%. Their delinquency at the credit union was .60% in January 2020. The road to recovery was challenging however, the Collection Department consistently reduced delinquency while under Plaintiff's leadership through consistency and perseverance.

11.     Most of the executive management employed when Plaintiff started in October 2014 are no longer with the credit union. Plaintiff managed to work diligently through changes that were made while meeting her goals. Most of the replaced executive managers are from out of

state. Plaintiff believes they have talent in the Rio Grande Valley to fill positions however, the new hires are not from Texas.   Of the executives that no longer work for the credit union, there are two that felt mistreated by the interim Chief Executive Officer ("CEO") Christine ("Chris") Dawe who is from Little Rock, Arkansas.  When Chris Dawe came in, the goal was to reduce the budget to improve the bottom line. Travel was placed on hold which included any potential training. Assistant Vice President titles were removed.

12.     There were two specific issues affecting Plaintiff when working with Chris Dawe. One was when she called Plaintiff in for a meeting and upon Plaintiff's arrival, she stated that Plaintiff should have arrived thirty minutes earlier to go over her review. Plaintiff advised her that she did not receive the meeting request and she stated that she must have not entered it into the calendar. Secondly, was when they had an audit with the National Credit Union Association ("NCUA").  The examiner wanted to know if Plaintiff had completed bankruptcy cram downs for mortgages. She advised the examiner that she did not but, had completed them for all other loans. Plaintiff was not aware they could do a cram down for a mortgage. There was no specific training involving cramdown through Blake Services.  During Plaintiff's meeting with the examiner, she questioned him how the Collections Department was doing based on his examination. The examiner stated that Plaintiff's department was doing well and to request additional training in the future. They spoke about Plaintiff's departmental efforts when they reviewed Plaintiff's Loan Loss Mitigation meeting notes considering she was the committee chair. During the exam time, Plaintiff reached out to Dominique Varner, attorney for Hughes Watters Askanase for a better understanding regarding bankruptcy mortgage cramdown. She mentioned to Plaintiff that considering their mortgage type, cramdown was not necessary. Plaintiff also questioned the attorney how to keep up with bankruptcy law. The attorney stated that bankruptcy laws are

constantly changed thus, she had to keep up with it yearly through seminars.  Plaintiff approached Chris Dawe to find out if there was an impact in the credit union's examination due to mortgage cramdown and she stated she did not know because she had not received the exam results.

13.     On or about November 2019, Patrick Rushenberg from New Mexico, became the new Chief Lending Officer. During their initial meeting, they spoke about training. They also spoke about working with his direct reports one on one.  He managed three employees: Plaintiff, Paul Wiles, the Lending Manager and Letty Lopez the Administrative Manager.   Patrick Rushenberg had an opening for a Mortgage Manager. During the first day, Plaintiff met Mr. Rushenberg, he questioned Plaintiff regarding why she had written up three employees. She advised him that it was due to attendance and punctuality. He stated that the write ups could affect the employees regarding future promotions.  Plaintiff advised him that she could show him their records reflecting the reasons why they were written up, and/or verbal warnings were administered and that her goal was to work with the employees to improve their attendance and punctuality. Plaintiff let him know that she had spoken to Human Resources ("HR") prior to the action and that she was given the okay to administer the write ups and return the documents to HR. On several occasions, he mentioned to Plaintiff that the Collections Department was a department that could be moved to the boiler room. He began giving Plaintiff a great deal of assignments to complete. Plaintiff had created a spreadsheet to document her progress with the additional workload along with the ones she had completed and others still pending. During a manager's meeting with Patrick Rushenberg, Paul Wiles, and Letty Lopez, Plaintiff was surprised to find out that neither the Lending Manager nor the Administrative Manager had the number of assignments that she did.

14.     On February 26, 2020, Plaintiff called Patrick Rushenberg to let him know she was not going to be able to go to work due to feeling ill. Plaintiff's doctor's office was not open, so she

had to go to the emergency room. Plaintiff had a temperature of 103 degrees and was feeling extremely ill. The doctor advised Plaintiff that she would have to be rushed by ambulance to the hospital due to an infection that was causing her illness. She was admitted to the hospital for a total of five days from February 26th to March 1st.  Diagnosis: Acute pyelonephritis and Sepsis.  Upon Plaintiff's release, the doctor in the hospital requested that she go see her primary doctor. Plaintiff did just that the following day. Her doctor advised her that her illness was severe and that she needed to take another week off for rest and that she would work on filling out her FMLA documents. On March 2, 2020, Plaintiff received a call from HR regarding FMLA. Trish Nowlan emailed Plaintiff the documents so that she could provide them to her primary care doctor.  Plaintiff provided her Family Medical Leave Act (FMLA) documentation to Trish Nolan upon her return.

15.     Upon Plaintiff's return from FMLA March 9, 2020, an email was sent to the Credit Union stating that the Lending Manager Paul Wiles was promoted to Lending Director. Plaintiff was surprised to find out about the promotion considering it was not announced to the credit union that there was an open Lending Director position.  Later that day, Plaintiff received a call from Chris Dawe, Patrick Rushenberg, and Barth Eke questioning her about the allocation report that she usually worked on in the beginning of every month. However, Plaintiff had been on FMLA. The conversation was not pleasant due to the confusion that involved the spreadsheet her team leader, Sylvia Rodriguez completed while she was out on FMLA.  Plaintiff let them know that she did not work on the report in the beginning of March because she was in the hospital. Plaintiff's Team Leader Sylvia had worked on it, however, not to its entirety.  Plaintiff let them know that she had corrected the report and went over the specific corrections.  Chris Dawe had reviewed the report that was not completed and then the one that she had corrected after completion.  Chris Dawe made a comment on the phone stating how did she know the other reports were correct.

Plaintiff was extremely disappointed in the comment because she worked extremely hard to make sure prior reports were correct. Plaintiff was also disappointed that neither questioned if she was ok considering she had just gotten out of the hospital. After the phone conversation, Sylvia Rodriguez mentioned to Plaintiff that she had spoken to Patrick Rushenberg regarding her not completing the report. Plaintiff sent Patrick an email advising him what errors were on the report that Sylvia created. On that Wednesday, they had a Loan Loss Mitigation meeting that Plaintiff chaired. What was different about this meeting was that Patrick Rushenberg had requested that Plaintiff invite her Team Leader Sylvia Rodriguez to attend. Plaintiff conducted the meeting like she had been doing for the last year and a half. Plaintiff felt that Mr. Rushenberg was acting different with her. She went to his office and questioned him regarding how she was doing. He stated that he felt Plaintiff was struggling during the Loan Loss Mitigation meeting based on an answer she had provided to a question by the new Chief Financial Officer, Barth Eke. He also mentioned that NCUA was coming back in May and that the credit union was close to coming out of special action. He asked how was he going to trust what Plaintiff would say to him, the CEO, the Board of Directors, and NCUA. Plaintiff was not sure why trust was an issue because she had met with the CEO, Board of Directors and NCUA in the past without issues.

16.     On March 18, 2020, they had a manager's meeting with Patrick Rushenberg and during the meeting, they discussed the pandemic and that the Collections Department would have to grow. They further discussed how the credit union would assist in helping the membership through Lending and Collections. Additional discussions continued as they spoke about allowing employees to take time off if sick. Additionally, they discussed allowing them to take vacation and if they had questions to reach out to him and HR. That same week, Plaintiff had an employee by the name of Irma Escamilla who was requesting time without pay due to the pandemic. She is one

of the employees that Plaintiff had administered a prior verbal warning due to time and attendance. She was an employee who refused a promotion a few months prior in Accounting due to pay.  Ms. Irma Escamilla was concerned about exposing her family to the virus considering she was going to work.  She was also willing to take time off without pay.  Plaintiff had spoken to Patrick Rushenberg regarding the conversation she had with Irma and he said to allow her to take the vacation or sick time, but unpaid time off would not be approved.  Shortly after Plaintiff's conversation with Patrick Rushenberg, an email was forwarded to her by HR regarding Plaintiff's employee's request of which Chris Dawe and Patrick Rushenberg were copied. Chris Dawe responded to Plaintiff's email disagreeing with her to allow the employee to take the time off.  She then sent an email to the credit union the next morning with specific instructions regarding how essential employees could request time off during the Pandemic. Irma Escamilla reached out to Plaintiff the following day the email went out to let her know she had no choice but to resign due to not being able to request unpaid time off, sick time, or vacation time during the pandemic.  She gathered her items and wanted to say goodbye to the team.  Plaintiff let her know it was not a good time because it was during the lunch hour and the team was on the phone.  Irma Escamilla responded, "Fuck you Belinda".  Plaintiff did not respond back to her and let her know that she would help her carry her items to her car.  She had a box and a plant; she was not able to carry both.  When they arrived at Irma Escamilla's car, Plaintiff gave her the plant and said, "God Bless You".  Plaintiff went over to Patrick Rushenberg's office to let him know what happened.  He stated that Irma Escamilla had given HR an earful but did not elaborate.

17.    Plaintiff was called to Edinburg on or about April 1, 2020 to review the allocation report Plaintiff normally accomplished at the beginning of every month with Chis Dawe and now Patrick Rushenberg.  At that point, Patrick Rushenberg and their new HR manager Vanessa

Olivarez met with Plaintiff  to advise that she was on administrative leave until further notice. Chris Dawe was not present during the meeting and her door was closed.  Plaintiff was told that the reason for the administrative leave was due to a violation and that a full investigation would have to be conducted. Plaintiff had to provide Veronica Olivarez with her key to the building in McAllen, as well as, her desk key. She stated that Plaintiff could not talk to any employees who worked in the credit union during the investigation and to only conduct her personal business through the drive thru.  Neither would elaborate regarding what the violation was. Patrick Rushenberg did make a comment that Plaintiff was not meeting performance for the job description of Collections Manager. Plaintiff felt that they were going to terminate her at that point considering how several executives that were previously placed on administrative leave did not come back to work for the credit union.  Veronica Olivarez and Patrick Rushenberg escorted Plaintiff out of the building.

18.     Veronica Olivarez contacted Plaintiff on April 17, 2020 to let her know that she was no longer the Department Manager for Collections. Plaintiff stated to her that she was concerned about her career and could not understand why she was placed in this position considering she had worked so hard in the Collections Department to meet goals and bring delinquency down to the current state. Veronica Olivarez stated that one could be a stellar employee for a long time and that if performance goes down in one month then they could be released.  She stated that considering Plaintiff had been with the credit union for many years and considering Covid-19 had left so many out of work, she would contact Plaintiff once she received notice of what position she was demoted to once approved by the CEO.  Ms. Veronica Olivarez stated she would call Plaintiff back in about two or three business days.

19.     On or about April 30, 2020, Veronica Olivarez called Plaintiff and requested that

she go to the Edinburg location on Friday May 1st at 4:00 pm.  Plaintiff arrived at 4:00pm that Friday, May1st and was escorted to the second-floor conference room.  Plaintiff met with Veronica Olivarez and Patrick Rushenberg.  Plaintiff was told by Veronica Olivarez that she was not removed from her position as the Department Manager for Collections after all.  Plaintiff was shocked considering their previous conversation. Veronica Olivarez said she did not tell Plaintiff she was no longer the Department Manager.  Plaintiff could not believe Ms. Olivrez was telling her this. Plaintiff told her that she told her this over the phone.  She stated that no wrongdoing was found on Plaintiff's part and that she would be placed on a Performance Improvement Plan ("PIP"). Both briefly reviewed the plan with Plaintiff and requested that she sign it.  Plaintiff advised them that she needed time to review the plan in detail and did not feel comfortable signing it.  Veronica stated that was fine and she and Patrick signed it. Plaintiff was told to report to the McAllen location on Monday, May 4, 2020.

20.     On May 2, 2020, Plaintiff started working on her Performance Improvement Plan (PIP) to have it ready upon her return on Monday.  The plan stated that Plaintiff had to demonstrate improvement in the areas of productivity, efficiency, teamwork, and quality.  Plaintiff was shocked to see that Patrick wrote in the email that the trending down in credit delinquency was Chris Dawe's doing.  Patrick Rushenberg also mentioned that in the beginning, the trending down in credit delinquency was due to Blake Services and that they were telling Plaintiff what to do. Plaintiff understood that they were in training but, she was the one who worked hard on the foundation and building up of that department while steadily reducing delinquency.  Patrick Rushenberg mentioned that the chart only showed that Plaintiff did not clean things up.  This was a broad statement to make when it was Plaintiff who worked hard daily from the start of her employment to the present to build the department where was.  Plaintiff reviewed the rest of the

plan closely and felt that the statements were one sided.  Plaintiff wanted to see the proof and if right or wrong, she would begin fixing the issues.

21.     On or about Monday May 4, 2020, Plaintiff reported to the McAllen location.  She was surprised to see that her office had been ransacked to the point Plaintiff knew files and items were missing.  She had to organize her items once again to try and understand what was gone.  Plaintiff tried to log on to the computer but, considering it had been a month since she was gone, Plaintiff had to seek assistance from IT.

22.     A few minutes after Plaintiff's arrival, Patrick went to her office and requested that she provide him the PIP.  He questioned if Plaintiff had emailed it from home to her computer at work.  Plaintiff let him know that she had taken in a hardcopy.  He told Plaintiff to scan the documents and send them to him.  A few minutes later he called Plaintiff again to see if she had scanned it.  Plaintiff advised him that she was still trying to scan it.  A few minutes later, Patrick went to Plaintiff's office and wanted to know if she had already sent it.  Plaintiff let him know that she had emailed her plan.  Plaintiff showed him her outbox had been sent but it was still showing in Plaintiff's outbox.  He then requested Plaintiff's hardcopy and said he would scan it and send to Chris Dawe.  Plaintiff provided him with her hardcopy and additional attachments.  During the day Plaintiff went to Patrick's office to try and catch up with what was going on with the Collections Department while Plaintiff was gone.  Plaintiff let him know that she wanted to request additional training involving excel.  She felt it was important due to the complexity of several reports requested.  Plaintiff let him know that she wanted to discuss the PIP in detail because there were several items on it that Plaintiff wanted to respond to.  He stated that Chris Dawe was traveling and that they would discuss it later.  He scheduled meetings to take place every Monday and Thursday at 1:00 P.M.  Plaintiff questioned him about items she was able to identify were

missing and he stated Mary Carpenter, the Chief Compliance Officer had placed them in a box.
He provided Plaintiff with some of the items.  She questioned him about her employee files, and
he stated that HR had them and to start new ones.

23.      On Tuesday May 5, 2020, Patrick and Plaintiff met about completing Allocation
and TDR for the month.  Plaintiff's team leader and she began working on the reports.  He went
to Plaintiff later that day and wanted to know how the report was coming along.  She let him know
she was finalizing it and that it would be done by the end of the business day.  He stated that he
was coming in at 8:00 a.m.  Plaintiff completed the report prior to leaving for that day.  On
Wednesday, May 6, 2020, Patrick and Plaintiff met to review the report.  He stated that it looked
good and gave Plaintiff instructions to send to Accounting and Chris Dawe.  He then requested
that Plaintiff complete the TDR report within an hour.  Plaintiff let him know that the TDR report
would take longer to complete, and it would be ready by noon.  When Plaintiff completed the
report a few minutes before noon, Plaintiff sent an email to the Accounting Department and Chris
as instructed. Plaintiff was not feeling well at this point and decided to go to lunch outside of the
credit union.  She bought lunch at a drive thru and parked in the parking lot of the restaurant.  She
began to cry, and Her heart was pumping fast.  Plaintiff felt extreme pressure and was worried
about her blood pressure and stress level.  Plaintiff did not feel comfortable going back to work
considering how bad she felt.  She called Veronica in HR to let her know she was not feeling well
and needed to go to a doctor.  Plaintiff also let her know she was feeling discriminated against.
Veronica's demeanor on the phone changed and she began to sound defensive stating that
discrimination was a serious accusation.  Plaintiff let her know that was how she felt.  She said
Plaintiff should let Patrick know Plaintiff was leaving for the day.  Plaintiff went back to the credit
union to let Patrick know and to picked up her bag.  He was on the phone with Veronica Olivares

and Chris Dawe.  He asked Plaintiff to go into the office and closed the door.

24.     When Plaintiff was in Patrick's office, Chris Dawe questioned her regarding what was going on.  Plaintiff let her know she was not feeling well and was going home.  She stated that Veronica had told her Plaintiff had mentioned she felt discriminated against.  Plaintiff let her know that she did feel discriminated against since she returned from her FMLA leave in March.  Chris Dawe stated if Plaintiff felt Patrick was discriminating against Plaintiff that she would have to work under her.  Plaintiff let her know she felt she was discriminating against her as well.  Plaintiff reiterated all that had happened after her return from the hospital including the phone conversation during the time she was placed on administrative leave.  Chris Dawe stated that she did tell Veronica to let Plaintiff know she was no longer the Department Manager because she felt Plaintiff was not meeting the expectations of the Department Manager position in Collections.  She stated it was a high stress job.  She asked Plaintiff if she was resigning.  Plaintiff let her know that she was not resigning because she was not a quitter and that she loved working for the credit union, she loved her team, and had retained the majority of them since the beginning of her employment. Chris Dawe stated that several people wanted to get rid of Plaintiff, but because she liked Plaintiff, she still had a job.  She stated that Plaintiff had not been meeting her performance based off her job description even when Plaintiff was working under her.  Plaintiff let her know that she was not once advised, she was not meeting her performance.  She stated that she trained Plaintiff to do the allocation.  Plaintiff told her she did not train her.  She had sent Plaintiff an example of the allocation and Plaintiff worked on building the spreadsheet herself.  She mentioned the cramdown that happened with NCUA and Plaintiff let her know she did not know.  She said she had worked with NCUA for a long time and had to do a song and dance because of it.  Plaintiff started to feel her blood pressure going up and began to cry.  That was not normal behavioral for Plaintiff because

she had always tried to be strong however, she felt she had to go see a doctor. The conversation ended and Plaintiff was in tears. Patrick questioned if Plaintiff wanted to sit for a few minutes to calm down. Plaintiff did and then let him know she was leaving for the day.

25. When Plaintiff got to her vehicle in the parking lot, she felt her heart racing and she began to cry profusely. Plaintiff was having trouble breathing and could barely talk. She called her husband and tried to talk to him. He told Plaintiff to stay where she was at and he'd would go over to her. He called the helpline on Plaintiff's insurance card and was able to get a hold of a nurse. The nurse advised him to take her to the emergency room immediately. When Plaintiff got to the emergency room, they took her in and tested her for Covid-19. They did not allow Plaintiff's husband in. They did an EKG and blood work and gave Plaintiff an IV and medication. Plaintiff was released in the evening with instructions to see her doctor the following day. DIAGNOSIS: Generalized anxiety disorder; Hypokalemia, Panic attack; Sepsis.

26. Plaintiff saw her doctor the following morning. Plaintiff's doctor knew immediately that she was not well. They spoke about Plaintiff's health and contributors. They spoke about the need for Plaintiff to go to counseling due to what was going on at work and the need for Plaintiff to see another specialist. She provided Plaintiff with an excuse for a leave of absence for thirty days. Plaintiff emailed the excuse to Trish Nowlan in HR. She called her the next morning to make sure she received the email. Trish stated that she did, and that Veronica would call Plaintiff back. Plaintiff did not receive a call back from Veronica.

27. On Monday, May 11, 2020, Plaintiff emailed Trisha to follow up on what she needed to do regarding the FMLA documents. She called Plaintiff back to check if she had received the email and attached forms. Plaintiff let her know she had not. Trisha stated that Veronica had sent Plaintiff an email and to check her spam. Plaintiff checked her spam folder and

found that the email was sent to her on the May 8, 2020 at 1:11p.m. The email that Veronica sent Plaintiff was regarding her FMLA responsibility.  In the body of the email she also mentioned that in Plaintiff's conversation with Chris Dawe, she had talked to her about her performance and that Plaintiff did not provide an acceptable action plan and further demonstrated that she would not be able to perform as the Collection Manager.  She further stated that Plaintiff would be given the opportunity to accept another position by Chris and that the opportunity would be available when Plaintiff returned to work.

28.     Plaintiff does not know why she was removed from her position as the Department Manager for Collections.  She does know that she no longer felt comfortable with the way she was being treated after coming out of the hospital and returning from her FMLA leave.  Prior to March 2020, Plaintiff did not have any negative discussions involving her performance.

29.     On July 17, 2020, Plaintiff notified the credit union by email that her Doctor had extended her FMLA leave to August 6, 2020. Trisha Nowlin, HR Representative contacted plaintiff by phone to discuss and pay for her health insurance.  Plaintiff went by the credit union drive thru located in Edinburg, Texas to pay for her health insurance as requested.  Plaintiff received a letter in the mail on July 22, 2020 dated July 20, 2020 stating that she had until 6:00 p.m. on that same day to complete and return a leave of absence form.  Plaintiff returned form as requested upon receiving notification.  Veronica Olivarez, HR Manager contacted Plaintiff by phone on July 23, 2020 to advise Plaintiff that she would get back to her regarding submission of document.  An email was sent by Veronica Olivarez notifying plaintiff that her job at Security First Credit Union had ended.  After Plaintiff was terminated, the Collections Department was is overseen by someone younger than Plaintiff within the Credit Union.

30.     During her employment with **SECURITY FIRST FEDERAL CREDIT UNION,** Plaintiff was subjected to discrimination and a hostile work environment.  Plaintiff believes she was wrongfully terminated.  Plaintiff believes she was discriminated against on account of her age (52 DOB: 06/04/1968) and her disability real or perceived.  Plaintiff also believe she was subject to disparate treatment and retaliated against for having requested and taken FMLA leave.

31.     Plaintiff alleges that there was no legitimate business justification for her termination in that the Plaintiff had always performed a satisfactory job for the Defendant employer during her employment and that there was work available and there continues to be work available which Plaintiff could perform.

## VI.
## Causes of Action – Wrongful Termination

**A.     Violations of the Age Discrimination In Employment Act and the  Americans With Disability Act Amendments Act ("ADA") as amended.**

32.     Plaintiff re-alleges the allegations contained in Section V, entitled *Factual Background*.

33.     Plaintiff alleges that she was discriminated against due to her age (52 DOB: 06/04/1968) and disabilities/perceived disabilities discrimination [Generalized anxiety disorder; Hypokalemia, Panic attack; Sepsis] (real, and/or perceived).

34.     On or about July 20, 2020, Plaintiff was unlawfully terminated discharged by members of Defendant's management due to discriminatory reasons and due to the culmination of discriminatory conduct directed against her by the Defendant.   Plaintiff was subject to disparate treatment and retaliated against for having requested and received FMLA.

35.     Plaintiff asserts that a motivating or determining factor in her unlawful termination was because she was discriminated against in violation of the Americans With Disability Act

Amendments Act ("ADA-AA"), the Age Discrimination in Employment Act  and Title VII of the Civil Rights Act of 1964 on account of her disabilities [Generalized anxiety disorder; Hypokalemia, Panic attack; Sepsis (real, and/or perceived), the Americans with Disability Act Amendments Act ("ADAA"). And Title VII of the Civil Rights of Act of 1964 on account of her age (52 DOB: 06/04/1968).

36.     Defendant, its agents, servants, and employees violated both the ADA and the ADEA by intentionally refusing to accommodate Plaintiff's disabilities and/or by discriminating against Plaintiff because of her age (52 DOB: 06/04/1968) and/or disabilities, perceived or real, by terminating Plaintiff's employment. Plaintiff's disability and/or by discriminating against Plaintiff because of her disabilities, perceived or real, were a determining or motivating factor in Defendant's decision to terminate Plaintiff's employment. Plaintiff's age (52 DOB: 06/04/1968); disabilities and/or by discriminating against Plaintiff because of her age (52 DOB: 06/04/1968); disabilities, perceived or real, moved Defendant toward its decision or was a factor that played a part in Defendant's employment decisions as to Plaintiff.

37.     As such, Plaintiff, falls within a protected class under the ADA and/or ADA-AA ("or "the Act"). *The Act* provides *as* follows:

An employer commits an unlawful employment practice if because of race, color, ***disability****,* religion, sex, or  national origin, the employer:

1.     ***Fails or refuses to hire an individual****,* ***discharges an individual, or discriminates in any other manner against the individual in connection with compensation or the terms, conditions, or privileges of employment***; or

2.     ***Limits, segregates or classifies*** an employee or applicant for employment in a manner that would deprive or tend to deprive an ***individual of any employment opportunity or adversely affect in any other manner the status of the employee.***

38.     Further, Plaintiff alleges that the wrongful termination by the Defendant employer was a form of retaliation because of her complaints of discrimination and wrongful termination. Such actions are prohibited by an employer as follows:

38.     An employer, labor union or employment agency commits an unlawful employment practice if the employer, labor union or employment agency **retaliates** or **discriminates** against a person who, under this Chapter:

   1.   **Opposes discriminatory practice**;
   2.   Makes or files a charge;
   3.   Files a complaint; or
   4.   Testifies, assists or participates in any manner in an investigation, proceeding or hearing.

40.     The federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. §621 *et seq*. was passed by Congress "to promote employment of older persons based on their ability rather than age [and] to prohibit arbitrary age discrimination in employment . . ." The ADEA protects people who are forty years of age or older. It prohibits discrimination on the basis of age in employment practices, including hiring, discharge, promotion, demotion, fringe benefits, training opportunities, working hours, and compensation. It also prohibits retaliation against an individual for opposing employment practices that discriminate based on age or for filing an age discrimination charge, testifying, or participating in any way in an investigation, proceeding, or litigation under the ADEA

41.     By the conduct as alleged herein, the Defendant unlawfully discriminated against Plaintiff in violation of the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. §621 *et seq*. both under a differential treatment and/or disparate impact theory of liability.

42.     As a result of the discriminatory treatment described above, Plaintiff's ultimate termination and/or the acts described herein, Plaintiff has suffered compensable damages as further alleged in this Complaint.

**VII.**
**Violations of The Family Medical Leave Act ("FMLA")**

43.     Plaintiff re-alleges the allegations contained in Section IV, entitled *Factual Background.*

44.     Defendant discriminated and/or retaliated against Plaintiff for exercise of her FMLA rights, specifically her taking FMLA leave, and/or unlawfully interfered with Plaintiff's rights to take FMLA leave, in violation of the FMLA, 29 U.S.C. §2601, *et seq.*

45.     In terminating Plaintiff's employment and/or refusing to rehire or return Plaintiff to work with similarly situated coworkers, Defendant interfered with, restrained, or denied the exercise or attempted exercise of Plaintiff's right to take FMLA leave; retaliated against Plaintiff because Plaintiff sought protection under the FMLA; and/or treated Plaintiff less favorably than employees who had not taken FMLA leave, requested FMA leave, and/or given notice of a need to take leave;

46.     Plaintiff has satisfied all jurisdictional prerequisites in connection with her claim under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et. seq.*

47.     Defendant is an "employer" as defined by the FMLA in 29 U.S.C. § 2611(4).

48.     During the time that Plaintiff was employed by Defendant, in 2020, she was an "eligible employee" as defined by the FMLA in 29 U.S.C. § 2611(2).

49.     While Plaintiff was employed by Defendant, Plaintiff had to be absent due to her health conditions, disabilities and medical needs.

50.     Plaintiff was entitled to leave due to her and her daughter's health conditions,

disabilities and medical needs as provided in the FMLA in 29 U.S.C. § 2612(a)(1)(C).

51. Plaintiff was approved for leave under the FMLA by Defendant. Defendant did not properly request additional information or seek proper certification from the employee for her FMLA qualifying leave nor did Defendant provide Plaintiff with an adequate written warning or sufficient time to provide additional documentation, which violates the protections of the FMLA as outlined in 29 C.F.R. § 825.208(a)(2) and 29 U.S.C. § 2613.

52. Defendant's conduct was in violation of 29 U.S.C. §2601, *et seq*.

53. As a result of the discriminatory treatment, her ultimate termination and the acts described herein, Plaintiff has suffered damages as further alleged in this Petition.

## VIII.
## <u>Actual Damages</u>

54. As a result of the incident made the basis of this suit, Plaintiff has incurred damages in the following respects:

**A. Lost Earnings and Special Damages**

55. At the time of the incident complained of, Plaintiff was gainfully employed. As a proximate result of the wrongful conduct and corresponding acts of the Defendant employer,

56. Plaintiff was unable to attend to her occupation and thereby suffered a loss of income for which she hereby sues.

57. As a result of the wrongful conduct and corresponding acts of the Defendant employer, the Plaintiff's earnings, retirement and capacity to earn a livelihood were severely impaired.

58. In all reasonable probability, the Plaintiff's loss of earnings and loss of earning capacity will continue long into the future, if not for the balance of the Plaintiff's natural life.

59.     Plaintiff therefore sues for any lost earnings in the form of back pay, lost wages, front pay, retirement benefits, and fringe benefits, lost future earnings and/or diminished earning capacity to the extent permitted by law due to the acts complained of above.

**B.      Past and Future Mental Anguish**

60.     As a result of the incident described above, that is made the basis of this suit, Plaintiff has suffered physical injuries, sickness and/or illness as well as emotional distress, loss of enjoyment of life, mental anguish and other hedonic damages.

61.     The Plaintiff has suffered feelings of anxiety, worthlessness, embarrassment, and inferiority.

62.     The Plaintiff has further suffered ill-health effects including, but not limited to, agitation, restlessness, sleeplessness, depression and/or loss of self-esteem due to the discriminatory treatment and/or her illegal termination or wrongful discharge.

63.     In all reasonable probability, Plaintiff will continue to suffer such physical injuries, sickness and/or illness as well as emotional distress, loss of enjoyment of life, mental anguish and other hedonic damages for a long time into the future, if not for the balance of her natural life.

## IX.
## Attorney's Fees

64.     By reason of the allegations of this Complaint and should Plaintiff be designated the "prevailing party", Plaintiff is entitled to recover attorney's fees in a sum that is reasonable and necessary.

65.     In this connection, Plaintiff will show that she has employed the undersigned attorney to assist her in the prosecution of this action.

66.     Plaintiff further seeks an upward adjustment or enhancement to the *lodestar* amount of attorney's fees to be determined in the prosecution of this lawsuit.

67.     A reasonable attorney's fee is further requested for the work expended in the preparation and trial of this cause along with a reasonable fee for any and all appeals to other courts.

68.     If ultimately successful in this case, plaintiff fully expects that the defendant employer will appeal this case.  Plaintiff seeks attorney's fees to compensate the plaintiff for the attorney's fees she has and will incur in the prosecution of this lawsuit, both at trial and on appeal.

69.     Plaintiff further pleads for the recovery of reasonable and necessary expenses for the use of associate counsel, paralegals and/or law clerks that assist in the prosecution of the case.

70.     As permitted, Plaintiff also seeks to re-coup all litigation expenses expended in the prosecution of this lawsuit.

## X.
## Exemplary Damages

71.     The conduct of the Defendant as set out above, was carried out and constituted such an entire want of care as to constitute a conscious indifference to the rights or welfare of the Plaintiff.

72.     Because of the spite, ill-will, malicious and/or fraudulent intent held by the Defendant's management toward the Plaintiff, such management, acting in a willful and intentional manner, committed certain acts calculated to cause injury and/or damage to the Plaintiff.

73.     Accordingly, the Defendant acted with malice, actual malice and/or a specific intent to injure the Plaintiff.

73.     Plaintiff is hereby entitled to recover exemplary or punitive damages to deter such cruel and undignified procedures by the Defendant and its management in the future.

74..     Accordingly, Plaintiff requests that punitive damages be awarded against the Defendant as a result of its egregious violations of the law.

## XI.
## Demand for Trial by Jury

75.     Plaintiff, by and through her attorney of record make and file this demand for Trial by Jury in the above styled and numbered cause.

76.     Plaintiff requests that this case be set on the jury docket of the court for disposition in due order and as soon as practicable.

**WHEREFORE,** Plaintiff, **BELINDA ABBY GARZA** prays that this Honorable Court grant the following:

(1)     Judgment against the Defendant, **SECURITY FIRST FEDERAL CREDIT UNION**, for the Plaintiff's actual damages;

(2)     Punitive damages;

(3)     Attorney's fees;

(4)     Pre-judgment interest allowed by law;

(5)     Interest on said judgment at the legal rate from the date of judgment;

(6)     For costs of suit herein; and

(7)     For such other and further relief at law or in equity to which the Plaintiff may show herself justly entitled to receive and for which she shall forever pray.

Respectfully submitted,

**THE LAW OFFICES OF
CINDY A. GARCIA, P.C.**
1113 Nightingale Ave.
McAllen, Texas 78504
Telephone: (956) 412-7055
Facsimile: (956) 412-7105
thegarcialawfirm@gmail.com
cluna.garcialaw@gmail.com

By: <u>/s/ cindy a. garcia</u>
   Cindy A. Garcia
   State Bar No. 07631710
   Federal ID No. 58460

**ATTORNEY FOR PLAINTIFF**
**BELINDA A. GARZA**